IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND; and ARTHUR H. BUNTE, JR., as TRUSTEE, | ) ) ) ) | No. 15 C 8070 |
| | ) | Judge Virginia M. Kendall |
| *Plaintiffs*, | ) | |
| v. | ) ) | |
| TEAM FINANCIAL FEDERAL CREDIT UNION, | ) ) ) | |
| *Defendants*. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Multiemployer pension fund Central States, Southeast and Southwest Areas Health and Welfare Fund and its Trustee Arthur H. Bunte, Jr., filed this suit against Team Financial Federal Credit Union to collect unpaid contributions, attorneys' fees and costs, and audit fees and costs that Central States claims employer Team owes to it pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. § 1132, and the Agreements between the parties. The parties filed cross-motions for summary judgment. For the following reasons, the Court grants Central States's Motion for Summary Judgment [39] and denies Team's Motion for Summary Judgment [42].

## <u>BACKGROUND</u>

The parties do not dispute the following facts unless otherwise noted.

Plaintiff Central States, Southeast and Southwest Areas Health and Welfare Fund ("Central States" or "Fund") is a large multiemployer benefit plan that serves as a trust fund for health, welfare, and pension benefits to employees at affiliated employers. The Fund relies on

contributions from employers pursuant to collective bargaining agreements and/or participation agreements that have been negotiated with employers.[1]  (Dkt. 51, ¶ 3.)  Defendant Team Financial Federal Credit Union ("Team"), a credit union, engaged Central States as a benefits fund for at least some of its employees.  (Dkt. 51, ¶¶ 5-6.)

## I.      The 1991 Agreement & Team's Contributions

On February 13, 1991, Team first entered into a Participation Agreement with the Fund ("1991 Participation Agreement").  (Dkt. 51-1, at 15, Ex. B.)  At that time, Central States used the same Participant Agreement template for all employers regardless of whether they were a party to a collective bargaining agreement ("CBA") with a union or, like Team, they were not party to a union CBA.[2]  (Dkt. 51, ¶¶ 9, 11.)  Because of this, the provisions of Team's 1991 Participation Agreement with Central States referred to a union and CBA even though Team's employees had neither.  (Dkt. 51, ¶ 11.)  For example, the 1991 Participation Agreement states: "[T]he Union and the Employer have entered into a collective bargaining agreement which provides for participation in the…FUND in order to obtain retirement and/or health benefits for employees (classification: Manager & Clerk) represented by the Union and employed by the Employer."  (Dkt. 51-1, at 15.)  Similarly, at the end of the document, the lines for the Union signature remain blank, while a Team representative signed the document as Employer.  (Dkt. 51-1, at 16.)

In that Agreement, Team agreed to contribute $78.00 per week to the fund "for its bargaining unit Employees pursuant to the terms of the collective bargaining agreement" and "only for such Employees" would the sum increase to $85.00 per week effective March 1, 1992

---

[1] Plaintiff Arthur H. Bunte, Jr., serves as the trustee of the Fund and therefore as the Fund's fiduciary as defined by ERISA.  (Dkt. 51, ¶ 4.)
[2] Furthermore, Team has not entered into a collective bargaining agreement at any point after the 1991 Participation Agreement.  (Dkt. 51, ¶ 9.)

and $93.00 per week effective March 1, 1993.[3]  (Dkt. 51-1, at 15, ¶ 5.)  The Employer and Union agreed to "represent to the Trustees that payments will be made only on behalf of Employees in the collective bargaining unit, excluding, by way of example…supervisors, among others" and to report to the Fund "any changes in the status of members that are applicable." (*Id.*, ¶¶ 6, 9.)  The Agreement states that it "shall continue in full force and effect until such time as the Employer notifies the Fund[] by certified mail." (*Id.*, ¶ 7.)[4]

The Participation Agreement goes on to define "Employee" as:

> *A person (other than a person employed in a supervisory capacity) who has been on the payroll of an Employer for at least thirty (30) days who is employed under the terms and conditions of a collective bargaining agreement as entered into between an Employer and a Union, and on whose behalf contributions are required to be made;… or* [a]ll persons employed *by the Union, as herein defined, upon being proposed by the Union and after acceptance by the Trustees…*

(Dkt. 51-1, at 16, ¶ 13) (emphasis added.)  This Participation Agreement also refers to the Trust Agreement ("Trust Agreement"), stating:

> *The Union and the Employer agree to be bound by, and hereby assent to, all of the terms of the Trust Agreement(s) creating said…FUND, as amended, all of the rules and regulations heretofore and hereafter adopted by the Trustees of said Trust Fund(s) pursuant to said Trust Agreement(s), and all of the actions of the Trustees in administering such Trust Fund(s) in accordance with the Trust Agreement(s) and rules adopted.*

(Dkt. 51-1, at 15, ¶ 1.)  The Trust Agreement as amended provides that Illinois law should govern it "except as such laws may be preempted by the laws and regulations of the United States." (Dkt. 41-2, at 27, Art. XI, § 7.)  The Trust Agreement specifies:

> *The ten-year Statute of Limitations applicable to actions on written contracts in the State of Illinois shall apply, provided that the limitations period for any such action shall not begin to accrue until the date upon which the Trustees and the Fund receive actual notice of the cause of action, claim and liability….*

(*Id.*)  In addition to the definition of "Employee" in the Participation Agreement, the Trust Agreement provides:

---

[3] The 1991 Participation Agreement did not distinguish or mention part-time employees.  (Dkt. 51, ¶ 13.)
[4] The Agreement states that Illinois law will govern its interpretation and implementation.  (Dkt. 51-1, at 15, ¶ 12.)

> All persons employed by an Employer...*as herein defined, under the terms and conditions of a Collective Bargaining Agreement entered into between the Employer and a Union...*and such other employees of the Employer as are proposed by the Employer *and accepted by the Trustees, on whose behalf payments are* required by agreement of the Employer or applicable law *to be made to the Fund by the Employer...*

(Dkt. 41-2, at 5, Art. I, § 3) (emphasis added.)[5]  The Trust Agreement reinforced that "[e]ach Employer shall remit continuing and prompt contributions to the Trust Fund as required by…applicable law and all rules and requirements for participation…as established and interpreted by the Trustees…" (Dkt. 41-2, at 12, Art. III, § 1.)[6]

Indeed, Team began to remit payments in 1991 on behalf of two employees: Carla Punch ("Punch") and Lynda Milton ("Milton").  (Dkt. 51, ¶¶ 43-44.)  Punch, a clerk at Team, had contributions paid on her behalf until July 1992.  Milton served in a supervisory capacity as Manager at Team until 2001 when she transitioned to her role as CEO.  Team continued to contribute on Milton's behalf, and only Milton's behalf, from August 1992 until August 2015. (Dkt. 51, ¶¶ 28, 43.)  Neither belonged to a union.  (Dkt. 51, ¶¶ 43-44, 60.)

## II.     Participation Agreements & Team's Contributions from 2001 – 2012

Come 2001, Central States had developed a Participation Agreement template specifically for employers who were not party to a CBA ("2002 Participation Agreement"). (Dkt. 51, ¶ 18; Dkt. 41-4, Ex. 2, at 10-11; Dkt. 41-3, ¶ 14.)  Central States mailed the new form to Team on November 7, 2001, outlining that Team would need to contribute $174.90 to the Health and Welfare Fund "on behalf of each Employee for each week during which the Employee either works or receives compensation" starting March 3, 2002.  (Dkt. 41-4, ¶ 3.)  The 2002

---

[5] The Trust Agreement provided a definition for "Employer" as well.  This includes any association or individual who agrees to be bound by the document and meets the criteria to participate, regardless of whether or not they are party to a collective bargaining agreement.  (Dkt. 51, ¶ 33.)  The parties do not dispute that Team constitutes an Employer under ERISA and these Agreements.

[6] The Trust Agreement refers to contributions that employers owe to the Fund "under the terms of any agreement," thus including both the Trust Agreement and a participation agreement.  (Dkt. 41-2, at 13, Art. III, § 1.)

Participation Agreement required Team to "report changes in its workforce" and explicitly stated that Illinois's 10-year statute of limitations would apply to any claim, which would start to run after the Fund received written notice of the liability. (Dkt. 41-4, ¶ 6.) To this end, the Trust Agreement maintained a 10-year limitations period that did not accrue "until the date upon which the Trustees and the Fund receive actual notice of the cause of action, claim and liability to which the limitations period is applicable." (Dkt. 51, ¶ 34.)

Perhaps most notably, the 2002 Participation Agreement defined "Employee" in as "each and every individual employed by [Team] on either a full-time or part-time basis." (Dkt. 41-4, ¶ 7.) Team did not sign the 2002 Participation Agreement but remitted contributions on Milton's behalf in accord with the new rate of $174.90 as of March 3, 2002. (Dkt. 51, ¶ 19.)

This pattern continued over the following years: Central States would mail a new Participation Agreement to Team and, though the Agreements went unsigned, Team would pay contributions on Milton's behalf consistent with the rate change. Indeed, Central States mailed a new Participation Agreement to Team in 2002, 2003, 2006, 2009, and 2012.[7] In each of those years, Team did not sign the Agreement. Yet for each rate increase, Team paid Central States weekly contributions on Milton's behalf that reflected those changes. (Dkt. 51, ¶¶ 20-24.) Team's payments responded to monthly bills that included a clause requiring Team to "…represen[t] that all employees eligible to participate in the Funds…are being reported and only eligible employees are being reported." (Dkt. 51, ¶ 46.) Further, each of these agreements required Team to pay on behalf of "each and every individual employed by [Team] on either a full-time or part-time basis." (Dkt. 51, ¶ 25.) The Fund relies on employers to self-report the work records of its eligible employees. (Dkt. 51, ¶¶ 45, 59.) Each Agreement also provided that

---

[7] Gaps exist between years because certain letters contained a schedule of rate increases in advance of subsequent years. For instance, the agreement mailed in 2012 included the rate of $268.00 per week for not only 2012 but also as of March 3, 2013. (*See* Dkt. 51, ¶¶ 20-24.)

"[Team] agrees to be bound by the terms of the…Fund trust agreement and all amendments adopted in the future…." (Dkt. 51, ¶ 26.)

Since the 1991 Participation Agreement, Team hired and employed Delores Gentry, Shelia Taylor, and Maria Hinojos. Team employed Delores Gentry ("Gentry") starting in 1997 and since 2006 she served as the Operations Manager. (Dkt. 51, ¶¶ 61-62.) Team employed Shelia Taylor ("Taylor") as a loan officer from January 2009 through December 2015. (Dkt. 51, ¶ 63.) After March 2, 2014, each worked more than 20 hours per at Team. (Dkt. 51, ¶¶ 61-64.) And from February 2006 to October 2010, Team employed Maria Hinojos as a bilingual loan officer who also performed office administrative tasks. (Dkt. 51, ¶ 65.) Team offered the opportunity to participate in the Fund to Gentry, Taylor, and Hinojos at or around the time of their hire with the understanding that these employees would reimburse Team for the contributions paid on their behalf either in full or in part.[8] (Dkt. 51, ¶¶ 48-49, 66.) Ultimately, Team did not contribute on behalf of Gentry, Taylor, or Hinojos.[9] (Dkt. 51, ¶¶ 67-69.)

III.    **The 2015 Participation Agreement & Central States's Audit of Team**

Central States sent Team yet another Participation Agreement on February 16, 2015, but a couple of changes occurred with this document. First, in the lead up to the 2015 Participation Agreement Team had represented to Central States that the Team only had one full-time and one part-time employee, and Team requested to exclude the part-time employee. (Dkt. 51, ¶¶ 28-29.) As such the 2015 Agreement denoted that the term "Employee" would not include "one part-time employee who works less than 20 hours per week." (*Id.*) In addition, Paragraph 6 clarifies that the term "Employee" means "as it has since [Team] began its participation in [the Fund] in

---

[8] Even though Team offered the opportunity to join the Fund to Hinojos, Team nonetheless disputes that it believed that its part-time employees were eligible to participate in the Fund. (Dkt. 51, ¶ 47.)
[9] Specifically, Team did not contribute on behalf of Gentry from January 1, 2006 to August 31, 2015; Taylor from January 1, 2009 to August 31, 2015; or Hinojos from February 1, 2006 to August 31, 2015. (Dkt. 51, ¶¶ 67-69.)

1991, each and every individual employed by [Team] on either a full-time or part-time basis…" (Dkt. 51, ¶ 30.) Team acknowledges that the Fund calculates its contribution rates on the assumption that all employees will participate equally in the Fund and the Fund cannot afford to provide benefits at rates computed at group averages if employees with lower-cost health claims or no claims opt out, whatever the reason. (Dkt. 51, ¶ 36.) Distinct from all of Team's Participation Agreements with Central States since 1991, Team Chairperson Mark Wilson signed this 2015 Participation Agreement. (Dkt. 51, ¶ 27.)

Since before its 1991 Agreement, Central States has made it a practice to review every agreement that requires contributions to ensure compliance with the Fund's rules, including the Fund's adverse selection/all-in-or-all-out rule that requires equal contributions from all employees of an employer who do not have a bargaining unit. (Dkt. 51, ¶ 38.) Accordingly, on January 28, 2015 Central States sent Team a letter saying that it would like to audit Team's contributions that March. (Dkt. 51, ¶¶ 50-51.) Central States employees Carol Evans and Justin Mackowiak conducted the audit. (Dkt. 51, ¶ 53.) Central States found that between 2006 and August 2015 the Fund paid claims totaling $1,308,539.62 for CEO Milton and her dependents while receiving $125,400.20 total contributions from Team on her behalf. (Dkt. 51, ¶ 50.) Central States also found that Team employed Gentry, Taylor, and Hinojos during this period. (Dkt. 51, ¶ 53.) On August 31, 2015 Team sent Central States a letter that said it wanted to withdraw from the Fund effective September 1, 2015. (Dkt. 51, ¶ 57; Dkt. 41-8, Ex. 5.)

Central States filed this suit two weeks later on September 14, 2015 pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, to recover what Central States's Health and Welfare Fund deems unpaid employer contributions

from Team for Employees Gentry, Taylor, and Hinojos. (*See* Dkt. 1.) The parties cross-move for summary judgment. (Dkt. 39; Dkt. 42.)

## STANDARD OF REVIEW

Courts grant summary judgment where the movant shows that no genuine dispute of material fact remains and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks and citation omitted). Courts appropriately grant summary judgment where "no reasonable jury could rule in favor of the nonmoving party." *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted). On cross-motions for summary judgment, each movant must satisfy the requirements. *See Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Therefore, when considering Central States's Motion, the Court views all evidence in the light most favorable to Team, and when considering Team's Motion, the Court views all evidence in the light most favorable to Central States. *See e.g., Hinsdale v. Village of Westchester, Illinois*, No. 15 C 4926, 2017 WL 991489, at *3 (N.D.Ill. Mar. 15, 2017) (citing *Int'l Bhd. Of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002)). Nonmoving parties must still put forth enough evidence to support reasonable inferences, as courts "draw only the reasonable inferences" and "are not required to draw every conceivable inference from the record*." Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009) (internal quotations and citations omitted); *see e.g., Cordon v. Centex Homes*, 835 F.Supp.2d 543, 548 (N.D.Ill. 2011).

<u>**DISCUSSION**</u>

By and large, Team contends that, under the various Agreements and in light of applicable law, Team does not owe contributions to Central States's Health and Welfare Fund on behalf of Gentry, Taylor, or Hinojos. Central States disagrees and seeks both unpaid contributions and associated costs.

**I.      Timeliness of Evidence Relating to Pre-2012 Claims**

As a threshold matter, Team argues that the Court should only allow Central States to assert that Team owes $87,861.00 in contributions, as initially stated in the Plaintiff's Response to Defendant's First Set of Interrogatories, and bar Central States from asserting an additional $184,421.10 in contributions[10] for failure to timely disclose the evidence for this calculation.

Federal Rule of Civil Procedure 37(c) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (exclusion automatic unless substantially justified or harmless). Under subsection (a), Rule 26 requires parties to disclose their damages calculation and any underlying evidence for those calculations based on the information reasonably available at that point, within 14 days of the parties' Rule 26 conference. Fed. R. Civ. P. 26(a)(1). Parties must supplement Rule 26(a) disclosures including interrogatories "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties .…" Fed. R. Civ. P. 26(e).

---

[10] Total, Central States asserts that Team owes $272,282.10 in unpaid contributions for Gentry, Taylor, and Hinojos. (*See* Dkt. 40, at 15; Dkt. 52, at 4.)

Central States admits that it produced an Audit Report detailing $272,282.10 in contributions for the first time on June 10, 2016 as an Amended Response to Interrogatories 2 and 4(a) of Defendant's First Set of Interrogatories. (Dkt. 55, ¶ 24; Dkt. 55-6, Ex. 6, Plaintiff's Amended Resp. and Audit.) In other words, Central States provided this revised document to Team four days after the close of fact discovery on June 7 and five days after Team deposed Central States's Auditor Evans on June 6. (*See* Dkt. 19; Dkt. 55, ¶ 22.) Team claims that this "surprised" them and that they had developed their defense and discovery to respond only to the Fund's claim that Team owed contributions between January 2012 and December 27, 2014, the dates that Central States had audited back in 2015 that prompted this suit. (Dkt. 52, at 4-6.)

Although Central States provided these amendments after close of discovery, Plaintiff's Amended Interrogatories were not untimely in that Central States provided these calculations within days of Team's deposition of Central States's Auditor Evans, which took place the day before the close of discovery and confirmed the exact damages given the confirmed hours and dates that Gentry, Taylor, and Hinojos worked. Team could have calculated its own damage figures from the evidence as it developed or strategized its next steps based on this deposition. In any case, Central States could not have realistically updated its calculations much earlier. On March 16, 2016 Team declined to produce any payroll records in response to Central States's Request for Production, and about a month and a half before the close of discovery Team provided an amended response on April 26, 2016 telling Central States that it did not have payroll records from before 2012. (Dkt. 55-5, Ex. 5, 3-4, 7.) Because of this, Central States had to base its initial calculations on what could be reasonably known from its Audit of Team, in compliance with Rule 26(a), and then needed to rely on evidence from the employees in question in order to fine tune the audit to the exact amount not paid in the years prior to 2012. Team

should have been able to access this information to more precisely predict the damages that Central States would ultimately demand, as the outstanding evidence consisted of the time and employment records of Team's employees.  *See* 29 U.S.C. § 1059(a)(1) (under ERISA, "every employer shall…maintain records with respect to each of his employees sufficient to determine the benefits due or may become due to such employees.").  Rule 26(e) only requires parties to supplement their responses "if the additional or corrective information has not otherwise been made known to the other parties…" and Team should have had at least some estimate of when and how long the individuals in question had worked for them prior to 2012 since they were Team's employees.  Fed. R. Civ. P. 26(e).  Besides, Team had earlier notice in this case that the damages could increase depending on when and how much Gentry, Taylor, and Hinojos worked at Team from both the Complaint[11] and the Joint Initial Status Report,[12] even assuming that the Audit did not provide enough of a clue.  Any surprise on Team's part comes from a lack of attention to detail or blissful ignorance.  The delay is thus both substantially justified, as Central States needed to collect depositions throughout the discovery process to refine its damages estimate, and harmless, as Team could have anticipated higher damages earlier in the case.  The Court therefore does not agree that Central States disclosed its damages in an untimely matter under Rule 37 and declines to bar the underlying evidence.

---

[11] Central States's Complaint alleged that "Team Financial breached the provisions of ERISA, the Participation Agreement and the Trust Agreement by failing to pay all of the contributions (and interest due thereon) owed to the Health and Welfare Fund for the period of January 2012 through December 2014, and upon information and belief from *as far back as January 2006* and continuing through August 2015" and "owes the Health and Welfare Fund *at least* $99,486 for unpaid contributions and interest for the period of January 2006 through August 2015, as a result…" (Dkt. 1, ¶¶ 20-21) (emphasis added).

[12] The Parties' Joint Status Report provided that "[u]pon information and belief, Plaintiffs also suspect that TFFCU has failed to pay all of the contributions (and interest due thereon) owed to the Health and Welfare Fund for the period beginning as far back as January 2006 and continuing through August 2015 as well…" and noted the principal factual issue as "[w]hether [Team] accurately reported the work history of its covered employees for the period of January 2006 and continuing through August 2015 and the amount of unpaid contributions as a result of [Team]'s failure to report during that period." (Dkt. 10, ¶¶ 3, 6.)

## II.    Statutes of Limitations

Team also contends that a statute of limitations bars Central States's claims.   Team operates on the assumption that the 1991 Participation Agreement governs the dispute and, as such, its ambiguity requires parol evidence to understand its terms and thus follows a 5-year statute of limitations in Illinois.  (Dkt. 52, at 12-13.)  Even assuming that this is true, the 1991 Participation Agreement states that the Employer "agree[s] to be bound by, and hereby assent[s] to, all of the terms of the Trust Agreement(s)…" (Dkt. 51-1, at 15, ¶ 1.)  The Court must read these documents together, since this language reveals the parties' intent that the Participation Agreement incorporates the Trust Agreement.  Even without this, courts typically read related contract documents together.  *See Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co.*, 73 F.3d 727, 731 (7th Cir. 1996).  The Trust Agreement not only provides that Illinois's 10-year statute of limitations for written contracts should apply, but it also states that the limitations period does not begin to run until the Fund receives "actual notice of the cause of action, claim and liability…."  (Dkt. 41-2, at 27, Art. XI, § 7.)  The Court may enforce these limitations provisions since they allow parties and courts reasonably sufficient opportunity for the judicial review of claims.  *See Heimeshoff v. Hartford Life & Accident Insurance Co., et al.*, 135 S.Ct. 604, 606-07 (2013) (holding that contractual limitations provisions should ordinarily be enforced as written if reasonable, especially in ERISA plan context).

Although Central States theoretically could have audited Team earlier than 2015, it did not.[13]  Instead, the Fund relied on Team to report changes in the workforce per the Participation Agreements.  (*See* Dkt. 41-4, ¶ 6; Dkt. 51-1, at 15, ¶¶ 6, 9.)  Yet Team did not report changes when Gentry came on board as a manager in 2006, or when Hinojos and Taylor joined as loan

---

[13] While under ERISA the Fund has the right to audit employers that does not mean that the Fund has a duty to audit employers.  *See Central States, Southeast and Southwest Areas Pension Fund, et al. v. Central Transport, Inc.*, 472 U.S. 559, 581 (1985).

officers respectively in 2006 and 2009. (*See* Dkt. 51, ¶¶ 61-69.) Thus Central States first learned of these changes during its 2015 Audit. (*See* Dkt. 51, ¶ 53.) At that point, the clock began to run. *See Heimeshoff*, 135 S.Ct. at 606-07; *Kroger Co.*, 73 F.3d at 731. (*See* Dkt. 41-2, at 27, Art. XI, § 7.) Central States filed this suit in September of the year of the audit – in other words, well within either statute of limitations.

In any case, even though ERISA does not set a statute of limitations for funds trying to collect outstanding employer contributions, such actions constitute written agreements entitled to a 10-year limitations period. *See Central States, Southeast and Southwest Areas Pension Fund v. Jordan*, 873 F.2d 149, 152-54 (7th Cir. 1989) (reversing application of Illinois 5-year statute of limitations for oral contracts in ERISA fund action to collect employer contributions because "it may take time for the Pension Fund to discover irregularities" and longer period "contributes to the stability of pension funds and…encourage[s] employers to meet their obligations"). Since all of the damages that Central States seeks here arise from 2006 or later, no limitations period blocks the Fund's claims since Central States filed this suit in 2015. Team's statute of limitations argument does not preclude Central States's claims on any of these grounds, so the action may proceed.

## III.    The Applicable Agreement

Team primarily disputes which Agreement should apply. At a minimum, Team at least does not dispute that the 2015 Agreement applies to Gentry and Taylor, the individuals in question who worked for Team at that time. Indeed, the 2015 Participation Agreement – signed on February 16 of that year, before the audit but after the audit request – clarifies that the term "Employee" means "as it has since [Team] began its participation in [the Fund] in 1991, each and every individual employed by [Team] on either a full-time or part-time basis…" (Dkt. 51, ¶

30.) Team thus unequivocally consented to this definition via Chairperson Wilson's signature on the 2015 Agreement, highlighted by Team's need to request that the Agreement explicitly exclude part-time employees for the first time. (See Dkt. 51, ¶¶ 28-29.) In doing so, Team acknowledges its obligation to have contributed to the Fund on behalf of all of its employees since 1991, which covers Gentry, Taylor, and even Hinojos, who usually worked part-time but only worked until 2010 before the Parties agreed to the part-time worker exclusion. (*See* Dkt. 51, ¶¶ 27-30.)

However, Team contends that the 1991 Participation Agreement governs the years leading up to 2015, the next year Team formally signed a new Participation Agreement with Central States.[14] (*See* Dkt. 51, ¶ 27.) Putting aside the 2015 Agreement and assuming the 1991 Participation Agreement controls, Team would still owe contributions to Central States on behalf of Gentry, Taylor, and Hinojos. Team deems the 1991 Participation Agreement "clear and unambiguous" in that it only requires Team to contribute on behalf of employees who are employed under the terms and conditions of a union CBA entered into between Team and a union. (Dkt. 44, at 5.) On its face, this contention cannot stand, as the 1991 Participation Agreement delineates (and Team simultaneously tries to argue) that the Agreement only applies to Team's Managers and Clerks, and Team made contributions to the Fund on behalf of Milton, a Manager from at least 1991 until 2001, despite the fact that she did not belong to union. (Dkt.

---

[14] Because of this, Team asserts that for choice of law purposes Illinois law governs given the 1991 Agreement's provision to this effect. (Dkt. 51-1, ¶ 12.) However, the 1991 Participation Agreement incorporates the Trust Agreement. *See Heimeshoff*, 135 S.Ct. at 606-07; *Kroger Co.*, 73 F.3d at 731. (Dkt. 51-1, at 15, ¶ 1.) The Trust Agreement excepts that Illinois laws "may be preempted by the laws and regulations of the United States." (Dkt. 41-2, at 27, Art. XI, § 7.) ERISA and subsequent case law make clear that ERISA supersedes state laws as they relate to employer contributions to multiemployer employee benefit plans. *See infra* 29 U.S.C. § 1144(a); 29 U.S.C. § 1145; *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1136 (1992). In any case, choice of law arguments come into play when deciding which state's law to apply, not whether to apply federal or state law, particularly in actions to collect delinquent fund contributions. *See Robbins v. Iowa Road Builders Co.*, 828 F.2d 1348, 1352-53 (8th Cir. 1987) (citing *Central States, Southeast & Southwest Areas Pension Fund v. Kraftco, Inc.*, 799 F.2d 1098, 1105 n. 5 (6th Cir. 1986) (en banc), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1291, 94 L.Ed.2d 147 (1987)), *distinguished on other grounds in Central States v. Kroger Co.*, No. 01 C 2680, 2003 WL 1720023, at *10 (N.D.Ill. Mar. 31, 2003).

51-1, at 15; Dkt. 51, ¶¶ 28, 43-44, 60.)  No Team employee belonged to a Union.  (Dkt. 51, ¶ 9.)  If the 1991 Participation Agreement only obligated Team to contribute on behalf of employees who belonged to a union subject to a CBA, Team would not contribute on behalf of any employee, rendering the Agreement futile.

If anything, Team's point questions the clarity of the 1991 Participation Agreement: if the employer signing the agreement does not have a CBA with any union, and an "Employee" is someone who is employed either "under the terms and conditions of a [CBA]" or is "employed by the Union," who is an "Employee" at an employer who does not have a CBA with a union?  A person reading this Agreement as written may think it clear, but applied in this context, a latent ambiguity arises.  Latent ambiguities occur where a contract otherwise clear on its face develops more than one way to reasonably interpret a document when applied to a particular dispute.  *See Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 542-43 (7th Cir. 2000).  To resolve this, courts look to "objective" extrinsic evidence.  *Id.* at 546.  The Court need look no further than the Parties' 2015 Participation Agreement, which provides objective evidence that the Parties agreed that "Employee" means "as it has since [Team] began its participation in [the Fund] in 1991, each and every individual employed by [Team] on either a full-time or part-time basis…"    (Dkt. 51, ¶ 30.)   This provision resolves that Team owes Central States for all employees till then, whether full or part-time, which covers Gentry, Taylor, and Hinojos.

Even without this provision, the Court can look to the objective evidence of established federal law to shed light.  The 1991 Agreement states that the parties "agree to be bound by the terms of the Trust Agreement(s)" creating the Fund.  (Dkt. 51-1, at 15, ¶ 1.)  *See also Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 63 (1995) (internal citations omitted) (recognizing that a document should be read to give effect to all of its provisions and

render them consistent with each other as a cardinal principle of contract construction). While the 1991 Participation Agreement only defines "Employees" in terms of those employed by a union, the Trust Agreement extends this to "such other employees of the Employer as are proposed by the Employer…on whose behalf payments are required by agreement of the Employer or applicable law…" (Dkt. 41-2, at 5, Art. I, § 3.) The Trust Agreement elaborates that Illinois law applies, except as preempted by federal law (Dkt. 41-2, at 27, Art. XI, § 7). Even by 1991, ERISA explicitly and sweepingly preempted state law, including in actions to collect contributions from employers. *See* 29 U.S.C. § 1144(a) (ERISA shall "supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan"); 29 U.S.C. § 1145 ("Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."); *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1136 (1992) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 45 (1987) and *Bartholet v. Reishauer A.G.*, 953 F.2d 1073, 1078 (7th Cir. 1992)) (holding that Congress has "blotted out (almost) all state law" regarding employee benefit plans). Given this, *Central States v. Gerber Truck Service, Inc.* illuminates the backdrop under which Team consented to the 1991 Agreement. To reach its holding, *Gerber Truck* found that welfare trusts like Central States avoid "adverse selection" – collecting contributions only on those employees who need benefits without collecting on those who do not need them. 870 F.2d 1148, 1151-52 (7th Cir. 1989). The members of a group must come in or out as a bloc in order to subsidize the benefits, known as the all-in-or-all-out rule. *See id.* at 1151-52, 1154-55. The *Gerber Truck* court noted that

"nothing in ERISA makes the obligation to contribute depend on the existence of a valid collective bargaining agreement…." *Id.* at 1153.

Like the employer in *Gerber Truck* who agreed through a participation agreement to contribute on behalf of all of its drivers notwithstanding its agreement to pay on behalf of all bargaining-unit employees, Team agreed to pay for all managers and clerks notwithstanding any agreement to pay for bargaining unit-employees. *See id.* By the time of the 1991 Agreement, applicable law already provided that an employer's agreeing to pay for "all" of a group of identified employees in an ERISA welfare fund participation agreement actually meant contributing for all of those individuals even if the other language separately guides the contributions that the employer must make on behalf of union employees. Contract language aside, *Gerber Truck* articulates how the all-in-or-all-out rule allows welfare fund schemes to function. *See id.* at 1151-52, 1154-55. Commercial reasonableness adds another useful lens when interpreting ambiguous contracts. *Sutter Ins. Co. v. Applied Systems, Inc.*, 393 F.3d 722, 726 (7th Cir. 2004) (internal citations omitted). This further solidifies that the 1991 Participation Agreement must have meant to include at least all managers and clerks, if not all employees, as a matter of law and economic principle.[15]

Even if clear and unambiguous, the 1991 Participation Agreement requires Team within its four corners to contribute on behalf of at least all of its Managers and Clerks. Since the Participation Agreement incorporates the Trust Agreement, and the Trust Agreement requires payments for "other employees of the Employer as are proposed by the Employer…on whose behalf payments are required by agreement of the Employer or applicable law…" (Dkt. 41-2, at

---

[15] Central States spends some pages arguing that Team cannot point to minutes from its Board of Directors meetings as objective extrinsic evidence of the meaning of the 1991 Agreement, but Team concedes this point by failing to raise or contest it either in its Motion for Summary Judgment or its Response to Central States's Motion for Summary Judgment. (*See* Dkt. 40, at 12-13; Dkt. 44; Dkt. 52; Dkt. 56.)

5, Art. I, § 3), Team agreed to make contributions on behalf of employees classified as "manager" or "clerk" as proposed in the Participation Agreement. (*See* Dkt. 51-1, at 15.) *See Kroger Co.*, 73 F.3d at 731 (advising courts to read related contract documents together). Together, these provisions together require Team to pay at least on behalf of Gentry starting in 2006 when she became the operations manager. (*See* Dkt. 51, ¶¶ 61-62.)

Regardless, the Participation Agreements between 2001 and 2012 define "Employee" as "each and every individual employed by [Team] on either a full-time or part-time basis." (Dkt. 41-4, ¶ 7; Dkt. 51, ¶¶ 19-25.) Team may not have signed any of these Agreements. But Team sent contributions to Central States on Milton's behalf at the increasing rates scheduled on these Agreements. (*Id.*) Accordingly, Team manifested its assent to these agreements. *See Line Construction Benefit Fund v. Allied Electrical Contractors, Inc.*, 591 F.3d 576, 580 (7th Cir. 2010) (even without signature, employer paying rate increased to fund constitutes "conduct manifesting assent [that] creates an obligation"); *Operating Engineers Local 139 Health Benefit Fund, et al. v. Gustafson Construction Corp.*, 258 F.3d 645, 649 (7th Cir. 2001).[16] Under this definition, as individuals employed by Team on either a full- or part-time basis, Team would owe Central States for the weeks worked by Gentry, Taylor, and Hinojos.

In sum, Team owes Central States contributions for the given employees, and the Parties do not dispute any material facts about their employment that would affect this Judgment. Under the 1991 Agreement, Team owes Central States on Gentry's behalf starting with her 2006 promotion to Operations Manager through August 2015 when Team withdrew from the Fund. (*See* Dkt. 51, ¶¶ 61-62.) As a "Manager," Team proposed and agreed to contribute on Gentry's

---

[16] Team disputes that it ever received these Agreements, but the mailing of the Agreements creates a rebuttable presumption that Team received the Agreements. *See In re Nimz Transp., Inc.*, 505 F.2d 177, 179 (1974). Team does not support this claim with evidence that overcomes this presumption, nor can it when Team paid the rate increases according to the schedules listed on them. (Dkt. 51, ¶¶ 19-25.) The Court therefore presumes that Team received these Agreements.

behalf by way of the 1991 Participation Agreement and the Trust Agreement's definition of Employee encompassing all employees proposed by the Employer.  (Dkt. 51-1, at 15; (Dkt. 41-2, at 5, Art. I, § 3.)  Loan Officers Taylor and Hinojos do not necessarily fall into the category of "clerks" proposed by Team, but read in the legal context of preemptive and applicable federal law, the 1991 Participation Agreement's obligation on Team to contribute on behalf of "all persons employed by the Union" translates into "all employees employed by the Employer" in an agreement that uses a template contract for all employers, including those who do not have CBAs with any union.  (Dkt. 51, ¶¶ 63, 65.)  *See* 29 U.S.C. §§ 1144(a) and 1145; *Gerber Truck*, 870 F.2d at 1151-55; *see also Sutter Ins. Co.*, 393 F.3d at 726; *Tolle*, 977 F.2d at 1136.  Further, the Participation Agreements from 2001 to 2012, Gentry, Taylor, and Hinojos all fall under the definition of "employee" as "each and every individual employed by [Team] on either a full-time or part-time basis," to which Team assented through its increased rate payments.  *Allied Electrical*, 591 F.3d at 580.  (Dkt. 41-4, ¶ 7; Dkt. 51, ¶¶ 19-25.)  Finally, under the 2015 Participation Agreement, Team indisputably owes contributions for Gentry and Taylor.  Team would even owe contributions for Hinojos under this Agreement because, though she typically worked part-time and left in 2010, the 2015 Agreement clarified that "employee" covers "as it has since [Team] began its participation in [the Fund] in 1991, each and every individual employed by [Team] on either a full-time or part-time basis…"[17] and so captures Hinojos within its definition.  (Dkt. 51, ¶ 30.)  Under these Agreements and relevant law, Team therefore owes Central States contributions on behalf of Gentry from her promotion in 2006 until August 2015, Taylor from January 2009 to December 2015, and Hinojos from February 2006 to October 2010.

---

[17] The 2015 Participation Agreement carve out excluding part-time employees arose from a request by Team and approval by Central Teams that same year, thus applying the provision starting at that point without retroactively applying this exclusion to the broader definition of "Employee" that the document provides.  (Dkt. 51, ¶¶ 28-30.)

## IV.  Injury

Briefly, Team also claims that Central States has not suffered any damages because the Fund could not have based the actuarial soundness of its plan on contributions that were to be made on behalf of employees unknown to Central States.  (Dkt. 44, at 6-7; Dkt. 52, at 10-11.) Team cites to *Joe McClelland* for support, but that case supports the opposite proposition.  In that case, the employer also submitted that the Fund did not establish injury in its claim because it did not show that the Fund would be required to make contributions on behalf of clients for which the employer did not make contributions.  *See Central States, Southeast and Southwest Areas Pension Fund v. Joe McClelland, Inc.*, 23 F.3d 1256, 1259 (7th Cir. 1994).  However, "[t]his misunderstands the nature of multi-employer, defined-benefit plans."  *Id.* Benefits plans must assume that many, if not a majority of employees will not receive payment benefits.  "Thus the Fund's injury is precisely that it did not receive contributions on behalf of persons who might never receive benefits."  *Id.*  The same injury applies here.  *See id.*

## V.  Damages

In judgments favoring an ERISA fund, Section 1132 requires courts to award the plan unpaid contributions with interest, either the greater of either interest on unpaid contributions or liquidated damages provided for under the plan in an amount not to exceed 20 percent of the unpaid contributions, reasonable attorneys' fees, and other relief as appropriate. 29 U.S.C. § 1132(g)(2).  The interest rate set forth in a trust agreement binds the employer.  *Central States, Southeast and Southwest Areas Pension Fund v. Bomar National, Inc.*, 253 F.3d 1011, 1020 (7th Cir. 2001).  The Parties' Trust Agreement states:

> *The interest payable by an Employer…shall be computed and charged to the Employer (a) at an annualized interest rate equal to two percent (2%) plus the prime interest rate established by the JPMorgan Chase Bank, NA for the fifteenth*

*(15th) day of the month for which the interest is charged, or (b) at an annualized rate of 7.5% (whichever is greater).*

(Dkt. 41-2, at 27, Art. XI, § 4.)  Further:

*Any judgment against an Employer for contributions owed to this Fund shall include the greater of (a) a doubling of the interest computed and charged in accordance with this section or (b) single interest computed and charged in accordance with this section plus liquidated damages in the amount of 20% of the unpaid contributions.*

(*Id.*)  Team does not dispute these terms.  (*See* Dkt. 51, ¶¶ 41-42.)

The Fund seeks unpaid contributions and accrued interest based on these agreed-upon remedies, Section 1132(g)(2)(A)-(B), and the calculations from the Fund's Auditor.  The audit reveals that Team owes the Fund $272,282.10 in unpaid contributions.  (Dkt. 41-7, at 6, ¶ 19; Dkt. 41-8, Ex. 6, Audit.)  Evans calculates the double interest owed on these through September 9, 2016 as $220,802.32, which the judgment shall include under these provisions (as the greater between this and a single interest calculation at $110,401.16 plus 20% of the unpaid damages at $54,456.42, totaling $164,857.58).  Team raises no material dispute with the Auditor's actual calculation.  The Fund accordingly is entitled to unpaid contributions and interest under the Trust Agreement in the amount of $272,282.10 plus $220,802.32, totaling $493,084.42.  *See* 29 U.S.C. § 1132(g)(2)(A)-(B); *Operating Engineers*, 258 F.3d at 654; *see e.g.*, *Central States, Southeast and Southwest Areas Pension Fund v. Wingra Stone Co.*, No. 11 C 6263, 2013 WL 707911, at *7-8 (Feb. 26, 2013), vacated on other grounds, 550 Fed.Appx. 332, 333 (7th Cir. Jan. 22, 2014).

Next, the Fund asks the Court to grant the Fund's audit fees and costs.  A prevailing party may recover audit costs under Section 1132(g)(2)(E), which allows "other legal or equitable relief as the court deems appropriate," so long as the costs are necessary and reasonable.  *See Trustees of Chicago Plastering Inst. Pension Trust v. Cork Plastering Co.*, 570 F.3d 890, 904-05 (7th Cir. 2009); *see e.g.*, *Wingra Stone Co.*, 2013 WL 707911, at *8.  The Fund submits time

sheets showing that the audit required 37.5 hours of total work at an hourly rate of $75, which works out to $2,812.50. (Dkt. 41-7, at 5, ¶ 15; Dkt. 41-8, at 13, Ex. 4, Summary of Audit Hours; Dkt. 51, ¶ 58.) As other courts have found, this Court is satisfied that these hours at the cost of $75.00 per hour were reasonable and necessary. *See id.* This rate is not unconscionable and, like the defendant in *Operating Engineers*, Team makes no effort to show that these rates are "so exorbitant as to be unconscionable in the circumstances." *Operating Engineers*, 258 F.3d at 655. The Court therefore allows Central States to recover these audit fees. *See* 29 U.S.C. § 1132(g)(2)(D). However, Central States and its exhibits only provide the costs for the auditors' expenses total $1,627.00 without any receipts or documentation to explain or verify these costs. The Fund therefore may not recover them. *See e.g.*, *Wingra Stone Co.*, 2013 WL 707911, at *8.

Finally, under Section 1132(g)(2)(D) and the Trust Agreement, the Fund is entitled to post-judgment interest at the greater of either the prime rate plus 2% or 7.5%. (Dkt. 41-2, at 27, Art. XI, § 4.) *See Bomar National*, 253 F.3d at 1019-20. The Fund is also entitled to reasonable attorneys' fees and costs, which the Parties should attempt in good faith to work out pursuant to Local Rule 54.3. *See e.g.*, *Wingra Stone Co.*, 2013 WL 707911, at *8.

## **CONCLUSION**

For these reasons, the Court grants Central States's Motion for Summary Judgment (Dkt. 39) and denies Team's Motion for Summary Judgment (Dkt. 42).  Central States is entitled to a judgment of $493,084.42 plus audit fees and post-judgment interest.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 1, 2017